Dayis, J.,
delivered the opinion of the court:
The subject-matter of this claim is the use by defendants of a turnpike in Virginia, connecting the south end of the Long bridge, opposite the city of Washington, with Alexandria.
Defendants’ demur to the petition — first, because the cause of action stated “ is without the jurisdiction of this court;” second, because facts are not stated “ sufficient to constitute a cause of action.”
In substance, and so far as important to the present contention, the petition avers that plaintiff is owner of a claim against defendants,“ for the use and occupancy of the ‘Alexandria and Washington turnpike road’” during some five years and more; that on the 24th day of May, 1861, “the United States, by her military officers, took full and entire possession of the said turnpike road, which was then in good condition and repair, and in constant use for travel and transportation,” for which tolls were being paid; that (on that day in May) “the Union army marched into and took possession of the county and city of Alexandria, under the authority of the United States, and at the same time removed the tollgate, excluded the tollgate-keeper and the agents and officers of said Turnpike Company from possession, and forbade the collection of tolls by them from any and all persons, and opened said turnpike road for free public travel and use, to the army and to all other persons, and so held possession and control and kept the same open for free travel and transportation ” until November 12,1866, when the road was “redelivered to the company,” and that during this time there was much travel and transportation, from which the owners of the turnpike received no return.
It is further alleged that in 1862 a demand was made upon *396 the Secretary of War and. the Quartermaster-General for the “restoration of the possession and control” of the road, “ which was refused by the said Secretary, and complete possession and control retained by the United States; ” that at divers times during the war claims for compensation were presented by the road to the President and to the Secretary of War, who gave assurance “ that the use, occupation, and control of said road should be paid for by the United States; ” that the only objection urged to payment of the claim is embodied in the following statement of the Secretary of War to the president of the Turnpike Company:
“ This road is in a rebel State, and its use by the United States, which obtained possession of it only b3r force of arms and at the cost of the blood of loyal men, should not be controlled or interfered with by private interests or corporations; and that military possession of the road be retained, and that no tolls be paid for its use by the officers, soldiers, or teams of the United States.”
Claim is made in the petition “for the use and occupancy of said turnpike road” during said period, and also “for the reconstruction thereof by the Turnpike Company;” but plaintiff’s attorney, in his brief, states the claim as one for use and occupation of the road only, and plaintiff now only seeks to recover “the equivalent of the tolls that would have been collected upon the turnpike road by the Turnpike Boad Company during its occupation by the United States.”
The claim, therefore, is not one technically for damage to property, but for the value of the use of the franchise — that is, recovery is sought for what the Turnpike Company would have received for tolls, had the road not been seized by defendants.
This case coming to us under the provisions of the “ Bowman Act,” is subject to the jurisdictional limitations imposed by that statute. The grant of jurisdiction in the first clause of the statute is broad, but as to claims founded upon acts which occurred during the late war, there is a substantial limitation in the third section, which provides:
The jurisdiction of said court shall not extend to or include any claim against the United States growing out of the destruction or damage to property by the Army and Navy during the war for the suppression of the rebellion, or the use and occupation of real estate by any part of the military or naval forces during said war at the seat of war.
*397 Tliis section has been brought before us several times for interpretation. In Beasely’s Case (21 C. Cls. R., p. 225) it appeared that to protect themselves from a threatened attack the Government forces in Tennessee had torn down a blacksmith shop, had used the material and some cord wood in the erection of temporary breast-works, the blacksmith’s tools disappearing in the event. That case we dismissed for want of jurisdiction, holding that—
" Congress did not intend [by the Bowman Act] to recognize in the remotest degree any liability on the part of the United States growing out of the prosecution of belligerent operations against the public enemy. * * * The very acts complained of were acts of war on the part of the forces of the United States, to wit, the erection of temporary breastworks or fortifications made necessary by the proximity of the enemy and his threatened attack. * * * The facts of the taking in this case * * * in effect establish a damage or destruction of property by the Army of the United States as a part of its belligerent operations against the Confederate forces. If, in the absence of actual or threatened hostilities, the military forces of the United States used the materials of a building for. purposes of use not incident to actual or threatened hostilities, then such material might be denominated supplies.”
In Heflebower’s Case (ibid., p. 228) the court held (p. 239) that (under the Bowman Act) it was prohibited from exercising jurisdiction in the instance a of claims growing out of the destruction of or damage to property, real or personal, by the Army or Kavy, wherever situated * * * and whether by the depredation of soldiers or the authority of officers, it being understood that this applies to all property where the taking, user, or occupancy was incident to the ravages of war and worked no benefit or saving to the Government from which a contract ought in equity and good conscience to be implied.” Also (ibid.) “of cases for the use and occupation of real property by the military and naval forces of the United States where at the time of the user and occupancy the territory was hostile, that is to say, where at the time of the user and occupancy the Army was operating, in the judgment of the President, in enemy’s country, and no means being authorized by the statute for ascertaining whether the owner adhered to the United States or to their enemies, no obligation of contract arises or can be implied.” Also (ibid., p. 240) u of cases for the use and occupation of real property on loyal *398 territory where the user or occupancy was caused by battles or marches, or was transitory in its nature and incident to the movement and operation of hostile forces, and was not for the prolonged camping, housing, or dwelling of troops.
The “ Overton Hotel” Case (23 C. C1s. R.,p.l86) decides “ that Congress, in the passage of the Bowman Act, intended to exclude from the jurisdiction of this court claims for the use and occupation of real estate begun by the military forces of the United States in their operations during the war at the seat of war and continued thereafter so long as said forces were engaged in military operations for the suppression of the rebellion.”
This court decided in the case of the The Chesapeake and Ohio Railway Company v. The United States (19 C. Cls. R., p. 300) that Virginia “ engaged in war against the United States,” April 17, 1861. (See also Carter’s Case, 23 C. Cls. R., p. 326.)
From the acts of the Government in relation to this turnpike, no contract arose by implication, for the seizure was by force for military purposes, and without intent or purpose to compensate the owners for any loss they might sustain. Nor was the use of the road (as the claim is nowmade) one for “ the use or occupation of real estate by any part of the military or naval forces of the United States in the operation of said forces during the said war at the seat of war.” On the contrary, the demand now made is for tolls, which but for the seizure would have been collected; that is for seizure of the franchise.
The distinction, however, is not important. Virginia was the seat of Avar May 24,1861, as Ave have already held, and as, in substance, the petition admits when it alleges that on that day “the Union army marched into and took possession of the county and city of Alexandria, under the authority of the United States.” So, if the claim were for the use and occupation of real estate, it would be excluded from our jurisdiction, as the real estate Avas at the seat of war when it Avas seized, and the road being thereafter used for military operations, the doctrines of the cases above cited apply. The claim, however, is nowmade for injury to the franchise; it is founded upon loss of profits, and therefore grows out of a damage to property by the Army during the war. This being so, the third section of the Bowman Act excludesit from our jurisdiction, and the casé-is dismissed.